Mr. Bloombridge. Thank you, Your Honor. I'm pleased to be here today. I feel I can't resist saying I have a sense of deja vu as I stand here, but hopefully this case will be less of an enigma than one we heard a while back. What I wanted to do was begin with the District Court's claim construction, which was with respect to the term monoclonal antibody, which was a homogenous population of a single type of antibody produced by a hybridoma and not including chimeric and humanized antibodies. I think we can split that into three parts. The first part, a homogenous population of a single type of antibody is undisputed. Everybody agrees that that's appropriate. Then what I would like to do is talk about the second part produced by hybridoma and then move to the third part, what I would think of as a negative limitation saying not including chimeric and humanized antibodies. Now, with respect to the first, with respect to the portion that says produced by a hybridoma... Mr. Bloombridge, just for clarification, are you saying that produced by a hybridoma, does that by itself necessarily exclude the chimeric antibodies? Are you saying that that language by itself is still open-ended enough that there's some mix of where it can be produced by a hybridoma yet still be a chimeric? We think, Your Honor, we think that as a practical matter, produced by a hybridoma would necessarily exclude chimeric. There's some things that were in the record below that said potentially there might be some kind of chimeric... So it's a little bit redundant, the negative limitation that was added to the claim construction. Right. That's correct, Your Honor. So produced by a hybridoma, the way we would look at that is to say what has been done here is to read in a method of making to a composition of matter claim. There's no dispute that the claim to a monoclonal antibody... But the issue is claim construction with respect to whether it includes humanized chimeric materials, and those aren't anywhere in the specification. Your Honor, that's correct, and I think that that leads us to what I was planning to get to in a second, but I'll happily talk about it now, which is I think the biggest single issue in this case boils down to this, whether a genus claim, otherwise properly supported, can validly cover species that are not disclosed or described within the patent document. And I think that's where the core of the dispute is. You mean properly construed, and to be construed to be unlimited. Yes, Your Honor, and in our view, that brings us back to the law of this court, since in abundantly clear that it is possible to have written description for a genus, and yet not have written description for every species within that genus. And that's what we're looking at here. That's not the issue. To encompass chimeric and humanized, there's got to be something in the specification. There's nothing. And as a matter of fact, as you know, in our Chiron case, we determined that the term monoclonal antibody in 1984 was not broad enough to encompass chimeric antibodies. Your Honor, I would respectfully disagree with that. First of all, I would say that following Ariadne, and indeed before Ariadne, going back to Enzo, it is abundantly clear that one way in which a genus may be supported is by a written description of the structural features common to the genus. And that's exactly what we find in the 923 patent. With respect to Chiron, I would submit, Your Honor, very respectfully, Chiron is talking about whether there was substantial evidence to support a jury verdict following a 13-day jury trial. Now, to the extent that Chiron, and Chiron in this case, both by the district court and by UCB, has been used primarily for the factual premise about what those of people in the art didn't know in 1984. Now, I think there's two things wrong with that. One is that Chiron is a case about whether there was substantial evidence to support a jury verdict. It's on an entirely different record, a record that Yeda here has never had a chance to make. Secondly, there is a 10-month difference in the priority dates between the patent in Chiron and the patent here. That 10 months turns out to be of vast importance with respect to this question, because as a Chiron case- Are you saying that the humanized chimeric antibodies bind to a human cytotoxin having a molecular weight of 17,500, et cetera? Is that supported by the record? Your Honor, what I would say when we look at the 923 patent, what we see is this is an example of an antibody patent. There is written description for the genus of antibodies by virtue of describing the antigen, a novel antigen not previously characterized. That's what these inventors contributed and described. The way we would look at that, Your Honor, is to say that in Ariad, the court expressly endorses the principle that there can be written description by virtue of describing the structural features common to the genus. In the case of an antibody- What are the structural features here? The CDRs, the complementarity determining regions, which are what confer the specificity for this antigen, TNF. That seems to be undisputed. For example, in the record at 1429, we have UCB's experts saying the CDRs are the portion that confer specificity for the antigen. What we have here then, Your Honor, is following the principle that this court adopted from the written description guidelines in ENSO. Again, referenced in Noel versus Liedemann and in Centacor, that there can be a situation in which when the contribution of the patent is a novel antigen, newly characterized- But Centacor went the other way. It did because in Centacor, the contribution precisely was not a novel antigen. It was in fact this antigen, TNF, previously characterized, first of all, by these inventors and therefore there was no way that Centacor could come into this court and say, we were the first to characterize this antigen. What these inventors contributed to the art was not a way of making antibodies. It wasn't an improvement in the other regions of the antibody. It was a showing that it was possible for the first time to make antibodies against TNF and to characterize TNF in such a way that others in the field could then make such antibodies. That was what they brought to the party, if you will. It precisely falls within the category of cases that Centacor did not, wherein the contribution is the novel antigen, not any method of making. Indeed, everyone concedes here that the hybridoma technique was well-known and routine in 1984 and therefore novelty could not possibly have resided in that technique. Your Honor, what we would say here is this is a case in which we take two principles and bring them together. The first principle is the principle of Ariadne, that one way properly to describe a genus is to identify the structural features common to that. I guess that's a concern I have with your case is that your premise is that the claim for a monoclonal antibody is a broad genus claim that covers any possible way to make this particular antibody that's monoclonal that binds to this cytotoxin. But what if monoclonal antibody, not to be any antibody that happens to be monoclonal, but had some different technical understanding of monoclonal antibody? That being the very definition that our opinion in Chiron cited to several treatises and dictionary definitions. To me, antibody that's monoclonal, that's produced by hybridoma, in fact, if you go back and look at the Coombs definition that your client cited to in the prosecution history, it's a very long definition that goes through punishing detail about how such monoclonal antibodies are produced by hybridomas. I think your Honor, the answer to that now view would be that monoclonal antibody is not a product by process definition. Monoclonal antibody is a thing. It's a population of antibodies that are all identical. And therefore, what we're talking about here, we know that the law of this court is that a composition of matter is not otherwise novel, is not limited by the method of making. That's, for example, the Vanguard case. I think as a general matter that's true. I'm asking on the facts of this case, what if all the dictionaries and treatises that discuss and define the term monoclonal antibody go a different way and specifically call out that what that term means to people in this part is an antibody that's made a particular way, i.e., produced by hybridoma? But again, I think I would come, and maybe the answer is that I just misunderstand or that I have a different view of that, Your Honor, but I would say that the answer is that we're talking about a thing. And even if people understood at the time that it was made by a particular process, if later in time a new process to make the same thing was invented, it would still be covered. And so, as, for example, this court's decision in Mgen v. Erck's Marion Roussel, where you have a later arising way of making a composition of matter not known at the time, right, even if at the time everybody would say, well, I know there's only one way to make that, right, the point is still that the claim is to a thing. And if later in time clever people come up with a new way of making that same thing, then it would be covered, and that these are not, in essence, product-by-process claims. So you're telling us that it's to be defined as literally covering. Are you also still arguing the doctrine of equivalence? Yes, Your Honor, and I'd be happy to turn to that if... Please turn to that. Right. So the first question, then, with respect to the doctrine of equivalence is whether there's a narrowing amendment here. And in our view, there is no such narrowing amendment, right? This brings us to the place where Claim 41 in the application, which issued as Claim 1, was never changed. And the narrowing amendment, then, is purportedly the cancellation of dependent claims that are, according to the district court, then operated, if you will, as a way of carving out the subject matter of the dependent claims from the scope of the independent claims. Isn't that a different question from equivalency? Let's assume that that's a pretty weak argument. Canceling the dependent claims says something that we need to take cognizance of. But does that affect your argument of equivalency? Let's say that it does narrow the claim. Equivalency is actually intended derived from a narrowed claim, rather than your initial argument that the claim is broad enough to be literally infringed. Is that correct? I'm not sure that I fully understand the question. But as much as I do, I don't think it's correct, Your Honor. In other words, I think the first question here is whether the scope of what For the sake of this argument, let's assume that you don't have the better of that argument. So it's changed. Does or doesn't that still entitle you to argue equivalency? Perhaps not successfully. I think it conceivably does. In other words, I think, Your Honor, at that point, we have to look at the reasons for the change. And I think this brings us then back to this question of written description. And the fact that what happened here was the office rejected the dependent claims on the basis that they were not described. But in our view, Your Honor, this, again, is the same question that we come back to, is what was the reason for which Yetta was not entitled to these claims? Mr. Brombridge, if you need to be administered an antibody for some reason, would you be just as happy to get a murine mouse antibody as a human antibody? In other words, they're equivalent? I personally would not, Your Honor. And I make no dispute that there is a contribution. There are many contributions of people after this. But we have a situation here. Would I be happy to be administered an antibody against TNF? Absolutely. Before this patent, that did not exist. These inventors showed the art that it was possible to make that. And Your Honor, in this regard, they made a contribution. It is absolutely clear that there were later contributions, many of which were patentable in their own right. But the premise of the district court seems to be that absent description of the accused embodiment, there could be no infringement. And Your Honor, we say that's wrong. this specification with respect to humanized chimeric? I think, Your Honor, the question is not enablement of humanized and chimeric. The question, and in our view, Well, you want the claim to cover it. We certainly do. In our view, and by the way, there was no question below. There was not a motion for summary judgment of invalidity below. We were talking about claim construction. So had there been a motion for summary judgment of invalidity, we would have made a record on these things. But enablement, there is certainly even in this record enough to show that chimeric antibodies were perfectly well enabled by the end of 1984. Humanized antibodies were not invented until 1986. No dispute about that. Notably, in the very first publication, the Jones paper, they are already described as monoclonal antibodies. You just said humanized antibodies were not invented until two years later. Correct. Yet this claim covers them. In our view, Your Honor, this claim covers, this is a genus, broad or otherwise, I'm not sure. It's a genus of antibodies that specifically bind TNF. And the reason for that is because those antibodies have, like the accused product here, CDRs that recognize, and in the accused product here, they're murine CDRs. So if we got the accused product, Your Honor, in answer to Your Honor's question, we would be getting a mouse antibody to the extent that it actually interacts with the antigen. And so in this instance, Your Honor, what the accused product is is the precise thing that the applicant said it wished to cover, a humanized derivative of a mouse antibody. And when we look at what the invention was here, in our view, it is clear that it is the portion of the antibody that recognizes human TNF and that that is the CDRs. And that's what these inventors contributed. That's the common structural feature of the genus. And that's described and enabled. Okay. Thank you. We'll save everybody time. I just want to ask one more question about the prosecution history. The dependent claims, 45 to 52, those were all dealing with chimeric, humanized, genetically engineered antibodies. In the face of a written description rejection, the applicant canceled all of those claims. And so I didn't see you citing in your gray brief our builder's concrete opinion, which talks about the idea that when you cancel subject matter, you know, claim subject matter from your application, you can't try to recapture that canceled subject matter through an allowed claim that was unamended, but nevertheless, you can't try to recapture that subject matter. The claim set, though, in builder's concrete is very different. So the asserted claim there is it was already a dependent claim, claim 10, which already and all along included the limitation that had to be added to the independent claim, claim 1, in order to gain allowance. Here the converse is true, right? The independent claim was never amended. And that's the claim that's asserted. These dependent claims were canceled. And the only way then that narrow scope is if the otherwise properly described and enabled independent claim now has a carve out, sort of Swiss cheese style, that where these independent, these dependent claims were canceled. And in our view, Your Honor, it's just not reasonable to read it that way. One of those claims that was canceled for lack of written description was to non-murine antibodies. No one would seriously contend that claim 1 cannot cover non-murine antibodies in view of this prosecution. And yet, the examiner was of the view there was no written description of that. It was enabled. It was properly within the scope of the broad claim 1. It wasn't described. And we can have cancellation of claims for lack of written description, which in no way suggests of species, which in no way suggests that the genus itself is a genus. We can go all the way back to Ruchik and say that was the situation in Ruchik. There's a validly described genus claim, but a lack of description of a particular species. So that is an absolutely common situation. That's the question. Validly described genus claim. Yes, Your Honor. With that, I'm way past my time and I will yield the podium here unless there are further questions. Okay. Now, as I was saying, we assume we've covered most of the questions. Mr. Treanor. May it please the Court. The issue before the panel is not whether later arising technology can, in some instances, be covered by the doctrine of equivalence. Probably the most significant issue before us, because we know that the doctrine of equivalence can reach later arising technology. We also know that a generic claim can cover later arising technology. It is a significant issue. It hasn't been argued that this technology existed before the filing date. That's correct. But that is a question, as you pointed out, of written description or enablement and that is an analysis that is, as you pointed out, follows claim construction. So the... For the literal claim construction, yes. Okay. Let us, perhaps your case is reasonably strong that there is neither written description nor enablement of the human chimeric antibody. But if, in fact, it's equivalent under the law, you don't... It's assumed that it's not literally covered or else you wouldn't have to resort to equivalency, which is not so easy to demonstrate in any case. I would agree with that, Your Honor. The issue here is the threshold question of how, in 1984, a person of ordinary skill would understand the term monoclonal antibody. Independently dispositive, the question is whether that person could possibly define monoclonal antibody as encompassing chimeric or humanized antibodies. Because that's later arising technology. We know it's monoclonal, but it's prepared differently. That's correct. It may be a close case in some situations, but in this case, the prosecution history compels affirmance of the district court's construction, at least insofar as it excludes chimeric and humanized. How is that? Eleven years later, they attempt literally to cover the technology that ensued after the initial filing date. The examiner didn't let them do it. That's correct. And there are two clear and unambiguous instances of this claim. That's literal infringement we're talking about. But let's talk about the terms of equivalency. Okay. I would say that in terms of equivalency, whatever equivalents are available under the doctrine of equivalence, they cannot include the precise subject matter that was disclaimed. So there may be instances, maybe even here, where there are equivalents of chimeric and humanized. But one thing is for certain, and that is that chimeric and humanized cannot be equivalents. You're saying that canceling the dependent claims was a disclaimer? Maybe they just were worn out? It's pending for 11 years. In this case, they are. In this court's decision in REOCS, that is exactly what happened. In Builder's Concrete as well, although they weren't dependent claims. And the most comprehensive analysis, at least in my reading, of the disclaimer issue is the Omega case. In the Omega case, this court exhaustively goes through where disclaimer started, starting with Schreiber-Shroff, our main case from the Supreme Court. Is this in fact after acquired technology? Wasn't something described in November of the month before the priority date? That's correct, Your Honor. And what was that? That's what's referred to as the Morrison paper. It's not of record. It was the subject of the district court's opinion, but the appellant elected not to include that in the appendix. That doesn't mean it's not of record. Pardon me? That doesn't mean it's not of record. The reference itself is not in the record. That's all I was saying, Your Honor. The Morrison paper is the very first disclosure of chimeric antibodies. So it doesn't speak to humanized antibodies. It's the very first disclosure ever, a few weeks before the filing date. And it does not, even if the Morrison paper discloses how to make, theoretically, a chimeric antibody, two things are important. Number one, Morrison and colleagues are, even as Yada points out, this is a landmark publication. So they are people of extraordinary skill in the art, not ordinary skill in the art. To draw from that that ordinarily skilled artisans in a few weeks all know how to make a chimeric antibody is unreasonable. And in any event, just disclosing how to make a chimeric antibody is a different question from how did one understand the term monoclonal antibody, more specifically, did that mean... But I was asking the question in the context of after arising technology. Okay. And you've essentially said it was not, chimeric was not after arising technology that had been described a month earlier. I think to ordinarily skilled artisans, it certainly was later arising technology. There's nothing other than that first publication in November of 1984. A publication is a publication, isn't it? Pardon me? A publication is a publication. That is correct. It wasn't enabling? I don't believe it was enabling. But I think the question is, even if it enables, does that mean, does it follow that those of ordinary skill now associate the term monoclonal antibody with chimeric antibodies? And I will point out that in that paper, the authors distinguish between monoclonal antibodies and chimeric antibodies. Even in 1986, when the Winter paper comes and discloses humanized antibodies, and I wanted to address that point, they don't call humanized antibodies monoclonals. In fact, they do the opposite. I think it's in the record at page 333, where in the summary of that paper, Winter and colleagues, Jones rather, Winter's the last author on the paper, discuss monoclonal antibodies and in the same breath, separately, their new chimeric antibodies. Sorry, they address chimeric antibodies separately from monoclonal. So even in 1986, two years after Morrison, those in the art are still distinguishing between monoclonal antibodies on the one hand and these other genetically engineered antibodies on the other. So that continues beyond 1984. Let me try a different way of getting at maybe some of the same issues we're talking about here. Let's assume for the moment that humanized antibodies, chimeric antibodies, weren't described or enabled as of December 1984, and the claim as best construed is restricted to antibodies produced by hybridoma, right? Across any species. Assume they were enabled? For rabbits, rats, mice, etc., but not for chimeric or humanized. So let's assume also that all these genetically engineered antibodies are later arising technology, after arising technology. Classically, you can go through doctrines of equivalence to try to reach people that are practicing the invention using after arising technology. So you have to then establish, saying your side has to establish that there was some kind of prosecution history estoppel, that they're barred from doing this. Now, throughout the prosecution, they seem pretty clear that they want coverage of chimeric antibodies, humanized antibodies, that they're not giving it up. And towards the tail end, January 2000, they said their claims are covering antibodies per se. So that suggests that they aren't looking to restrict their claim to just hybridoma produced antibodies. So why is there a disclaimer under those circumstances? Because the focus is not on what the applicant wants or intends. It's on the impact that the prosecution history has on the public and the competitors. So no competitor or other member of the public could reasonably read the record any other way. There are two clear disclaimers. 12 years into the patent is the first time we ever see the word genetically engineered antibodies. It's 14 years in where we start to have an exchange about the breadth of a claim that was Claim 31 that was originally to the patent for, with reference only to the antibody, the single antibody described in the patent, which is called CT1. In 1988, four years in, they had added that claim and added the language and derived therefrom. The examiner repeatedly rejected it nine times over nine years. And then we get to 1996, and the inventors do as you suggest. They let the examiner know, we think this should cover chimeric and humanized and genetically engineered antibodies. He says, you have no support for that. That claim is amended, that's prosecution history estoppel, to delete that language. Between the time that amendment was made and the time that the applicants received the examiner's notice of allowance, Remicade is approved by the FDA. That's the first, that's the chimeric anti-TNF antibody. So the applicants appear to have tried again, this time through the dependent claim route. The fact that they're dependent claims still means that the term monoclonal antibody is carried into that claim. Disclaimer, prosecution disclaimer, prosecution history estoppel, are not anchored to any particular claim. They're anchored to the claim term. So wherever that term is used, the estoppel or the disclaimer would apply. I thought they canceled dependent claims and what's now claim one were added at the same time. And then the dependent claims were canceled when the examiner wouldn't allow them. Is that an incorrect recollection? They were added at the same time. Okay. And it's claim 41 also received enablement and written description rejections, and also received the same comments from the examiner, that there is no support in the specification for genetically engineered antibodies. What the applicants did in response was to say we're concerned with limiting that claim to mouse monoclonal antibodies, because we're not sure if you limit it that way, whether it'll cover chimeric or humanized, and we're looking for coverage for those types of antibodies. And the examiner said, no, the dependent claims are explicit to those types of antibodies. The examiner rejected them on the same basis, and those claims were canceled. For lack of enablement, but the new generic claim that included them was not rejected for lack of enablement. Claim 41? 41. It was rejected for both. But it was allowed. It was allowed in response to a declaration where the examiner noted in allowing the claim, I'm withdrawing the rejection on the basis of the Engelman declaration, which made two points. One is the claim was enabled at the time. It was within the skill of those in the art to make antibodies from more than just the mouse species. The second point that Engelman made was because of the Morrison paper, I believe one of ordinary skill in the art would have been enabled to make chimeric antibodies. So two things on that. One, if you look at the Engelman declaration, he himself distinguishes the meaning of that term. He uses monoclonal separate from chimeric. Number two, the point that he made on Morrison and the enablement for genetically engineered antibodies as distinguished from the species of origin was not the basis. The stated allowance and withdrawal of that rejection was simply, was limited to the species of origin. Right. I think you want to be careful about how you're characterizing the grounds of the paper. The examiner, she never relied on a written description theory for chimeric antibodies. It was solely a scope of enablement, 112 rejection, based on her view that a claim for monoclonal antibody couldn't enable antibodies across all species. And I think this is maybe helping you. That's important because it reveals the examiner never thought application 41 covered chimeric antibodies. And so therefore, when she allowed the claim, it was purely after being convinced that such a claim across all hybridoma, you know, was enabled. I think that is the takeaway from the prosecution, Your Honor. And so therefore, allowing that claim was not a commentary that she thought potentially that chimeric antibodies were either supported or enabled by this patent. At least with respect to prosecution history estoppel, I'm not sure that the basis for the amendment would change the fact that there's an estoppel. The exchange, the long-term, years-long discourse between the applicant and the examiner about wanting to cover these antibodies in any number of claims, which other broad claims were rejected on the same basis that just had different language, like inhibited by the reference monoclonal, that was a 112 written description rejection of 41. And there's a very consistent pattern of we'd like to get coverage, and the examiner's saying you're not entitled to it. You have a cancellation of claims in the second instance. You have a narrowing amendment in the first instance. So as I suggested, the impact on the public is what matters. I think as a competitor, you read that and say they tried to get these claims. They couldn't get them. That is outside the boundaries of their intellectual property. And that fact implicates all of the issues on appeal. My time is up, but if you have any other questions. Any more questions? Thank you, Mr. Treanor. Thank you, Your Honor. Thank you for your time and consideration. Mr. Broombridge, you have three minutes. Thank you very much, Your Honor. I would just like to say that looking at the doctrine of equivalence, if in fact the claims are construed so that monoclonal antibody only means the product of a hybridoma, then claim 41 by definition was not narrowed. It never covered the things that the dependent claims purported to cover, and cancellation of those claims could not have affected the scope of claim 41. They were, if you will, improperly dependent, if that's what monoclonal antibody is construed to mean. And therefore, the cancellation of them should not be a bar to claim 41 having some scope of equivalence with respect to after arising technology. Does that argument help you if you state that they were improper dependent claims? Well, I think certainly in the applicant's view at the time was that they were not improperly dependent claims, and the applicant made clear, and this is with reference to the exchanges that Judge Chen mentioned, we are taking out the reference to the method of making and we believe that monoclonal antibody is covered even by genetically engineered techniques and so on. So the applicant, I think, certainly didn't think they were improperly dependent. If looking back at this one says, well, monoclonal antibody at the time and now, you know, only meant things produced by ibridoma, then in that case, claims that reach matter that isn't produced by ibridoma would have been improperly dependent, and cancellation of those claims would not have operated to carve anything out, if you will, from claim 41. Why isn't that something of a wooden understanding of prosecution history, Estoppel? Because if application claim 41 had said a monoclonal antibody, including chimeric antibodies, that claim certainly would have been rejected for encompassing chimeric antibodies. You would have had to delete that for lack of written description, and then you're saying, okay, that application claim would be barred from pursuing doctrine of equivalence under prosecution history, Estoppel, but because that very same claim subject matter for chimeric antibodies was in the dependent claim, the improperly drafted dependent claim, that claim subject matter, which was ultimately canceled for lack of written description, cannot be used as a bar to stop. I think you're on the way I would look at that is to say that all of this is not the correct reading of the prosecution history, that the dependent claims were never rejected for being improperly dependent. They were being, is hearing the applicant say, I think claim 41 includes genetically engineered antibodies. The examiner, if the examiner disagreed, the examiner should have come back and said, then I reject claim 41 as embracing subject matter for which there is neither written description nor enablement. That never happened, and in fact, in our view, the correct reading of this is the examiner said, you are entitled to a broad generic claim. What you're not entitled to are general claims that go to undescribed species within that genus, and that's the proper reading of the exchange. I'm saying if we read it differently and say monoclonal antibody never embraced genetically engineered species in the examiner's mind, then we, in that case, there would be no narrowing of claim 41. Either way, you can get to a place, in our view, should get to a place where there can be some form of coverage of this type of embodiment, namely a humanized derivative of a mouse antibody. The one last point I would like to make is that I think Mr. Treanor misspoke when he said there was no disclosure other than the November 1984 Morrison paper. There is in the record, and this is at 2441 to 45, the Kabili paper published in June of 1984, which talks about expression, in other words, genetic engineering, and then it's published in June of 1984, and it's in the Proceedings of the National Academy of Science, and it specifically says these approaches, genetic engineering, could lead to alternative ways of preparing stable human monoclonal antibodies. It's an explicit reference using monoclonal antibody to refer to genetically engineered material. It's in the record, and it's in combination with the statements of our experts and other things referred to in the record about the state of the art make it clear, in our view, that as of December 1984, the term monoclonal antibody did include genetically engineered material. Could you give me the JA site one more time? Yes. The paper as a whole is JA2441, and the portion that I quoted is JA2445, and it is the very final paragraph of the text before the acknowledgments and references. Thank you, Mr. Groombridge, and thank you, Mr. Treanor. The case is taken into submission.